**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **PET-AG, INC.**, a Delaware corporation,, ) | |
| ) | Case No: 1:23-cv-537 |
| Plaintiff, ) | |
| ) | Hon. John F. Kness |
| v. ) | |
| ) | |
| **VIGLERS LLC**, a Florida limited liability ) | |
| company, and **JOHN DOES 1-10**, individually ) | |
| or as corporations/business entities, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
AGAINST DEFENDANT VIGLERS LLC**

As set forth in the Complaint filed by Plaintiff Pet-Ag, Inc. ("Pet-Ag"), Defendant Viglers LLC ("Viglers") is advertising and selling a high volume of non-genuine goods bearing Pet-Ag's registered trademarks on www.amazon.com ("Amazon"). Despite being served with the Summons and Complaint, Viglers has failed to plead or otherwise defend this action and the Court entered a default against Viglers on March 23, 2013. (ECF 14.)

Pursuant to Federal Rule of Civil Procedure 55(b), Pet-Ag now respectfully requests that the Court enter a default judgment against Viglers. Pet-Ag's proposed default judgment does not include an award of damages and requests only the issuance of a permanent injunction that would prohibit Viglers from selling infringing products using Pet-Ag's trademarks.

**I.     FACTUAL BACKGROUND**

Pet-Ag manufactures and distributes pet and animal feeding and health products ("Pet-Ag products"). (ECF 1 at ¶¶ 10-12.) Pet-Ag sells its products under various trademarks that have been registered with the United States Patent and Trademark Office ("USPTO"). (*Id.* at ¶¶ 16-21 (listing trademarks).) Pet-Ag allows its products to be sold to end-user consumers in the United

States only by sellers—including national pet chains and independent retailers—who Pet-Ag has expressly authorized to sell Pet-Ag products ("Authorized Sellers"). (*Id.* at ¶ 13.)

Pet-Ag contractually requires its Authorized Sellers to follow numerous quality controls when storing, handling, and selling Pet-Ag products. (*See id.* at ¶¶ 14-15, 46-68.) For example, Pet-Ag requires Authorized Sellers to inspect products and report issues to Pet-Ag, store products according to Pet-Ag's guidelines, refrain from altering Pet-Ag products or packaging, manage product inventory on a "first-in, first-out" basis, prevent customers from receiving expired or near-expired products, familiarize themselves with Pet-Ag products and provide prompt customer service, and cooperate with Pet-Ag with respect to the enforcement of quality controls including by allowing Pet-Ag to inspect their facilities, assisting in the dissemination of safety and recall information to consumers, and reporting consumer complaints regarding Pet-Ag products to Pet-Ag. (*Id.* at ¶¶ 58-66.) Pet-Ag also requires Authorized Sellers to buy Pet-Ag products only from authorized sources and prohibits Authorized Sellers from selling products to any third party who is not an Authorized Seller and intends to resell the products. (*Id.* at ¶¶ 54-55.) These rules are designed to prevent unauthorized sellers from obtaining and reselling products outside of Pet-Ag's quality controls and ensure that Pet-Ag products follow a verifiable chain-of-custody from Pet-Ag to the end consumer. (*Id.* at ¶¶ 54, 57.)

Because product quality risks are particularly heightened when products are sold online, Pet-Ag requires its Authorized Sellers that sell online to follow additional requirements. (*See id.* at ¶¶ 69-90.) Authorized Sellers are allowed to sell Pet-Ag products on the Internet only on websites they own and operate unless they submit applications and receive written approval from Pet-Ag to sell through other websites. (*Id.* at ¶¶ 56, 69-74.) As part of the application process, Authorized Sellers must provide information about their business and undergo vetting by Pet-Ag

2

that includes review of their business operating record and online review history. (*Id.* at ¶¶ 56, 73.) Authorized Sellers that sell through their own websites or other approved websites ("Authorized Online Sellers") must then comply with further requirements including having a mechanism for receiving online customer feedback, keeping and providing to Pet-Ag all customer feedback they receive regarding sales of Pet-Ag products, clearly stating their business name and current contact information, and not using any third-party fulfillment service that could cause customers to receive Pet-Ag products from an unauthorized seller's product stock when they purchase products. (*Id.* at ¶¶ 75-80.) Pet-Ag has authorized only a single Authorized Seller to sell on the Amazon marketplace, and that Authorized Seller must comply with further, even more heightened quality controls including conducting a four-step inspection process of all Pet-Ag products it sells on and providing a report each month that includes extensive information about its adherence to Pet-Ag's quality controls and feedback received from customers. (*Id.* at ¶¶ 81-90.) Finally, Pet-Ag also ensures that all of its Authorized Online Sellers are continuing to follow its quality controls through an auditing program that includes examination of the websites where Authorized Online Sellers sell Pet-Ag products, online reviews on those websites, and test purchases of Pet-Ag products from Authorized Sellers' websites. (*Id.* at ¶¶ 91-95.) If Pet-Ag discovers that an Authorized Online Seller is selling Pet-Ag products of poor quality or otherwise not adhering to Pet-Ag's quality control or customer service requirements, it has the ability to investigate the Authorized Seller and take corrective action including suspending or terminating its status as an Authorized Seller. (*Id.* at ¶ 95.)

Pet-Ag's quality control requirements are important because unauthorized sellers that are not contractually required to follow Pet-Ag's requirements often sell poor quality products to consumers. (*See id.* at ¶¶ 27-32.) This problem is especially severe on online marketplace

websites like Amazon because consumers cannot examine products before purchasing them and often falsely believe they are purchasing from the manufacturer or an authorized seller rather than from an unauthorized seller that is outside of and does not abide by the manufacturer's quality controls. (*Id.* at ¶¶ 25-26, 33-35.) Consumers who purchased Pet-Ag products from unauthorized sellers on Amazon have received poor quality products and left extremely negative online reviews of the products that harm Pet-Ag's reputation and cause Pet-Ag to lose sales. (*See id.* at ¶¶ 36-44.)

To further increase consumer confidence in its products, Pet-Ag also provides the Pet-Ag Satisfaction Guarantee with Pet-Ag products that are sold to consumers by Authorized Sellers. (*Id* at ¶¶ 96-98.) Under the Pet-Ag Satisfaction Guarantee, a customer is able to receive a replacement or full refund within 60 days of the date of purchase if they are dissatisfied with their product for any reason. (*Id.* at ¶ 97.) However, products sold by unauthorized sellers do not come with the Pet-Ag Satisfaction Guarantee because Pet-Ag cannot guarantee the quality of products sold by sellers that are outside of and not subject to Pet-Ag's quality control requirements. (*Id.* at ¶ 98.)

Because the unauthorized sale of Pet-Ag products over the Internet threatens the safety of consumers and their animals and the goodwill associated with Pet-Ag's trademarks, Pet-Ag monitors the Internet for unauthorized listings of Pet-Ag products. (*Id.* at ¶ 99,) Through this effort, Pet-Ag discovered that Viglers is selling a high volume of products bearing Pet-Ag's trademarks through a storefront on Amazon called "Your Unique Store." that has an Amazon "Merchant ID" of AP72YTIQSCKMK (the "Amazon Storefront"). (*Id.* at ¶¶ 100-102, 110.)[1] On August 15, 2022, Pet-Ag sent a cease-and-desist letter to Viglers explaining that Viglers is

---

[1] Viglers' Amazon Storefront can be accessed at
https://www.amazon.com//sp?seller=AP72YTIQSCKMK . (*Id.* at ¶ 110.)

4

infringing Pet-Ag's trademarks, interfering with Pet-Ag's agreements with its Authorized Sellers, and causing harm to Pet-Ag through its sales of non-genuine products bearing Pet-Ag's trademarks. (*Id.* at ¶ 103.) Pet-Ag also informed Viglers that Pet-Ag is located in Illinois and harmed in Illinois as a result of Viglers' sales. (*Id.*) Viglers did not respond to Pet-Ag's August 15 letter or to follow-up letters Pet-Ag sent on September 2, 2022 and October 6. 2022, and continued to sell infringing products bearing Pet-Ag's trademarks through its Amazon Storefront. (*Id.* at ¶¶ 104-106.) Customers have written reviews of Viglers' Amazon Storefront in which they complained of receiving products that were tampered with, unsealed, and damaged (*see id.* at ¶¶ 118-119), and these reviews are similar to negative reviews of Pet-Ag products Viglers has sold that appear on the Amazon website. (*Id.* at ¶¶ 43-45. 120.)

On January 27, 2023, Pet-Ag filed its Complaint against Viglers and brought claims for trademark infringement and unfair competition under federal and Illinois law as well as tortious interference with existing contracts and business relationships. (*See* ECF 1.) On February 10, 2023, Pet-Ag served the Summons and Complaint on Viglers. (ECF 9.) Viglers failed to appear, answer, or otherwise respond to Pet-Ag's complaint and the Court granted Pet-Ag's motion for entry of default on March 23, 2023. (ECF 14.)

## II.    LAW AND ARGUMENT

When a default has been entered, all well-pleaded factual allegations relating to liability are taken as true. *VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016). In this case, the well-pleaded allegations of Pet-Ag's complaint establish that the Court has jurisdiction over this case, that Pet-Ag has stated claims against Viglers, and that Pet-Ag is entitled to a permanent injunction. Accordingly, the Court should grant this motion.

A. <u>The Court has jurisdiction over this case and Viglers LLC</u>.

The Court has subject matter jurisdiction over Pet-Ag's Lanham Act claims based on federal question jurisdiction, 28 U.S.C. §§ 1331, 1338, and jurisdiction over Pet-Ag's Illinois state law claims based on supplemental jurisdiction, 28 U.S.C. § 1367, because they are part of the same case or controversy as its federal claims, both challenging Viglers' sales of products that infringe Pet-Ag's trademarks.

The Court also has personal jurisdiction over Viglers because it has sold substantial quantities of infringing products bearing Pet-Ag's trademarks to consumers in Illinois through its Amazon Storefront while knowing that Pet-Ag is located in Illinois and harmed in Illinois as a result of Viglers' sales. (ECF No. 1 at ¶¶ 6-7, 103, 108-09.) Because Illinois' long-arm statute allows for the exercise of personal jurisdiction to the full extent permissible under the United States Constitution, federal courts in Illinois have specific personal jurisdiction over nonresident defendants if: (1) the defendant "purposefully availed [itself] of the privilege of conducting business in [Illinois] or purposefully directed [its] activities at [Illinois]"; (2) the plaintiff's injury [arose] out of the defendant's forum-related activities"; an (3) the "exercise of personal jurisdiction [comports] with traditional notions of fair play and substantial justice." *Curry v. Revolution Labs, LLC*, 949 F.3d 385, 393, 398 (7th Cir. 2020).

Numerous federal courts within Illinois and around the country have held that these constitutional Due Process standards are satisfied—and thus that a defendant is subject to specific personal jurisdiction—when, as in this case: (1) the plaintiff is located in the forum state; (2) an out-of-state defendant is selling products through a highly interactive, commercial website that infringe the plaintiff's intellectual property or otherwise give rise to the plaintiff's claims; and (3) the defendant has sold products that give rise to the plaintiff's claims into the forum state, with

6

knowledge that the plaintiff is located in forum state and is harmed in the forum state as a result of the sales. *See, e.g., NBA Props. v. HANWJH*, 46 F.4th 614, 623-27 (7th Cir. 2022) (out-of-state defendant subject to personal jurisdiction because it sold an allegedly infringing and counterfeit product through Amazon to plaintiff's counsel in forum state);[2] *ADG Concerns, Inc. v. Tsalevich LLC*, No. 18-cv-00818-NC, 2018 U.S. Dist. LEXIS 155542, at *6 & n.4 (N.D. Cal. Aug. 31, 2018) (defaulted defendant was subject to personal jurisdiction because of allegations that defendant had sold infringing products into forum state through Amazon); *Fairly Odd Treasures, LLC v. P'ships & Unincorporated Ass'ns*, 2020 U.S. Dist. LEXIS 247712, at *2 (N.D. Ill. Aug. 26, 2020) (finding personal jurisdiction and entering default judgment against defendants that sold counterfeits online and thus "aimed such site at Illinois by standing ready, willing and able to ship its counterfeit goods to customers in Illinois"); *Leach v. Pharmedoc Inc.*, No. CIV-16-1034-M, 2017 U.S. Dist. LEXIS 33565, at *2-7 (W.D. Okla. Mar. 9, 2017) (out-of-state defendant subject to personal jurisdiction because it "was operating a commercial business through Amazon," its "internet-based activities established regular business with foreign jurisdictions, including [the forum state]," and it had sold "at least four, and likely more" infringing products to residents in the forum state); *Std. Process, Inc. v. Antitrend LLC*, No. 19-cv-99-jdb, 2020 U.S. Dist. LEXIS 17386, at *9-13 (W.D. Wis. Feb. 4, 2020) (defendant subject to personal jurisdiction because it sold infringing products into forum state through Amazon); *Valtech, LLC v. 18th Ave. Toys, Ltd.*, No. 14 C 134, 2015 U.S. Dist. LEXIS 17138, at *8-15 (N.D. Ill. Feb. 12, 2015) (same). Consistent with the reasoning in these cases, Pet-Ag's jurisdictional allegations—which must be accepted as true, *VLM Food Trading*, 811 F.3d at 255—establish that this Court has personal jurisdiction over Viglers.

---

[2] Viglers' sales of infringing products bearing Pet-Ag's trademarks into Illinois include a sale to Pet-Ag's counsel in Illinois, like the defendant in *NBA Props*. (ECF 1 at ¶¶ 7-8.)

Finally, Viglers was also properly served with process on February 10, 2023 when Pet-Ag's Complaint and the Court's Summons were delivered to Viglers' registered agent. (ECF 9; ECF 11.) Pet-Ag also served the Court's March 23 order entering default and Pet-Ag's underlying motion on Viglers on March 28, 2023 by mailing and having the materials delivered to a new registered agent that Viglers designated on February 22, 2023 after it was served with process. (*See* ECF 15.)

Accordingly, default against Viglers was properly entered and this Court has personal jurisdiction over Viglers and this case.

B. <u>Pet-Ag has properly stated claims for relief.</u>

Pet-Ag has also sufficiently stated all of its claims against Viglers. Default judgment is proper when the plaintiff has properly pled its claims, taking "all of the Plaintiff's factual allegations, except as to damages . . . as true." *MetroPCS v. Devor*, 215 F. Supp. 3d 626, 632 (N.D. Ill. 2016); *see, e.g.*, *Quincy Bioscience, LLC v. Ellishbooks*, 957 F.3d 725, 729-31 (7th Cir. 2020) (affirming default judgment against defendant who sold allegedly stolen products on Amazon under plaintiff's trademarks because "the fact that the products were stolen was alleged in the complaint and established by the default"). For the following reasons, Pet-Ag has properly stated each of the claims in its complaint.

    1. *Pet-Ag has properly pled trademark infringement, unfair competition, and violation of the Illinois Deceptive Trade Practice Act.*

Pet-Ag's claims for trademark infringement under the Lanham Act, unfair competition under the Lanham Act, violation of the Illinois Uniform Deceptive Trade Practices Act, and trademark infringement under Illinois common law all have the same elements of proof. *See Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1038 (N.D. Ill. 2001); *Tony Jones Apparel, Inc. v. Indigo USA, LLC*, No. 03 C 0280, 2003 U.S. Dist. LEXIS 16815, *15-16 (N.D. Ill. Sep. 23, 2003). To prevail on each of these claims, Pet-Ag must show that: (1) it has a

protectable trademark; and (2) Viglers' use of the mark is likely to cause confusion among consumers. *See Trans Union*, 142 F. Supp. 2d at 1038; *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001); *see also M-F-G Corp. v. EMRA Corp.*, 626 F. Supp. 699, 707 (N.D. Ill. 1985) (stating that "'likelihood of confusion' has the same meaning under the Deceptive Trade Practices Act as it has in trademark infringement cases.").

Although courts generally consider a group of factors in determining whether a defendant's use of a trademark created a likelihood of confusion, courts conduct a different analysis when, as in this case, a defendant is reselling products the plaintiff manufactured that bear the plaintiff's actual marks. In this circumstance, courts hold that the defendant's sales are likely to cause confusion if the products it sells are (1) materially different from products sold by the plaintiff, *see, e.g., Brilliance Audio, Inc. v. Haights Cross Communs., Inc.*, 474 F.3d 365, 370 (6th Cir. 2007); *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1071-73 (10th Cir. 2009); *Davidoff & Cie., S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001); *Societe Des Produits Nestle, S.A. v. Case Helvetica, Inc.*, 982 F.2d 633, 638 (1st Cir. 1992), or (2) the products being sold do not meet with the plaintiff's legitimate quality controls or are being sold in a manner that prevents the plaintiff from being able to exercise its quality controls. *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006); *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243-44 (2d Cir. 2009); *Skullcandy, Inc. v. Filter USA, Inc.*, No. 2:18-CV-00748-DAK, 2019 U.S. Dist. LEXIS 104393, at *22-26 (D. Utah June 21, 2019); *Desmond v. Chi. Boxed Beef Distribs.*, 921 F. Supp. 2d 872, 881 (N.D. Ill. 2013).

Here, Pet-Ag has properly alleged that it owns valid, protectable trademarks. (ECF 1 at ¶¶ 16-17.) Pet-Ag has also properly alleged that Viglers' use of Pet-Ag's trademarks is creating a likelihood of confusion. First, Pet-Ag has alleged that Viglers is selling non-genuine products that

9

are materially different from genuine Pet-Ag products because they are not eligible for the Pet-Ag Satisfaction Guarantee and do not come with the same customer service benefits that come with genuine Pet-Ag products sold by Pet-Ag's Authorized Sellers. (*Id.* at ¶¶ 66-68, 96-98, 124-128, 164.) Numerous courts have held that differences in benefits such as guarantees, warranties, and customer service commitments are material differences that can create a likelihood of consumer confusion. *See, e.g., ABG Prime Grp., Inc. v. Innovative Salon Prods.*, No. 17-12280, 2018 U.S. Dist. LEXIS 98196, at *10-13 (E.D. Mich. June 12, 2018) (holding that plaintiff stated claim for trademark infringement because of allegation that defendant was selling products bearing plaintiff's trademarks that were not covered by plaintiff's satisfaction guarantee); *Herbalife Int'l of Am., Inc. v. Healthy1 Inc.*, No. 2:18-cv-6378-JFW-JC, 2019 U.S. Dist. LEXIS 113805, at *11 & n.7 (C.D. Cal. July 8, 2019) (same); *Beltronics*, 562 F.3d at 1073 (affirming preliminary injunction against defendant that was reselling products without plaintiff's warranty and concluding that every court to have considered the issue has determined that "material differences may include warranties and service commitments."); *cf. Davidoff*, 263 F.3d at 1302 (explaining that a "material difference" is any difference that consumers consider relevant to a decision about whether to purchase a product" and that "the threshold of materiality must be kept low to include even subtle differences between products."); *Brilliance Audio*, 474 F.3d at 370 (explaining that because "[t]he question of materiality is a fact-based inquiry . . . . an allegation of a material difference cannot properly be dismissed on 12(b)(6) grounds.").

Second, Pet-Ag has alleged that the products Viglers is selling are not subject to Pet-Ag's quality control requirements and interfere with Pet-Ag's ability to exercise its quality controls. (ECF No. 1 at ¶¶ 13-15, 46-95, 111-123, 164.) Courts around the country have held that such allegations state a claim for trademark infringement. *See, e.g., Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, 837

10

F. Supp. 2d 208, 229-30 (S.D.N.Y. 2011) (stating that plaintiff has claim for infringement when defendant's resale of plaintiff's product "deprives [plaintiff] of an opportunity to exercise quality control."); *Hand & Nail Harmony, Inc. v. Int'l Nail Co.*, 2015 U.S. Dist. LEXIS 67421, at \*28-29 (C.D. Cal. May 22, 2015) (plaintiff has infringement claim if "defendant is distributing [plaintiff's] goods in a way that does not meet the trademark holder's quality control standards, and such conduct may devalue the mark by tarnishing its image"); *Desmond,* 921 F. Supp. 2d at 881-83 (denying motion to dismiss because plaintiff alleged that defendant was selling products bearing plaintiff's trademarks outside of plaintiff's quality controls); *Skullcandy*, 2019 U.S. Dist. LEXIS 104393, at \*22-26 (denying motion to dismiss because defendant was selling products in manner that "interfered with the trademark holder's ability to implement its quality controls"; defendant's argument that quality controls would not prevent against "latent defects in products" was "inapposite" because the "actual quality of the goods" sold by defendant is "irrelevant"); *see also Lorillard*, 453 F.3d at 382 (explaining that, in quality control cases, "the harm stems not from the actual quality of the goods (which is legally irrelevant) but rather from [the trademark owner's] loss of control over the quality of goods that bear its marks."); *Zino Davidoff*, 571 F.3d at 243 ("Where the alleged infringer has interfered with the trademark holder's ability to control quality, the trademark holder's claim is not defeated because of failure to show that the goods sold were defective. That is because the interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark."); *API v. Cooper*, 718 F.3d 347, 359 (4th Cir. 2013) ("The actual quality of the goods is irrelevant; it is the control of the quality that a trademark holder is entitled to maintain.").[3]

---

[3] Although not necessary to state a claim under the "quality control exception" to the first sale doctrine, Pet-Ag has also alleged in detail how Viglers is likely failing to abide by Pet-Ag's quality controls and selling poor quality products that cause consumers to write negative reviews of Pet-Ag products on Amazon. (ECF 1 at ¶¶ 43-45, 118-120.)

Accordingly, Pet-Ag has stated a claim for trademark infringement under 15 U.S.C. §§ 1114 and 1125(a) (Count 1 in the complaint), unfair competition under 15 U.S.C. § 1125(a) (Count 2), violation of the Illinois Uniform Deceptive Trade Practices Act (Count 3), and trademark infringement under Illinois common law (Count 4).

          2.     *Pet-Ag has properly pled tortious interference.*

Pet-Ag has also sufficiently pled a tortious interference claim against Viglers. The elements of tortious interference with contractual relations under Illinois law are: (1) "the existence of a valid and enforceable contract between the plaintiff and a third party"; (2) "the defendant's awareness of the contractual relationship; (3) "the defendant's intentional and, if defendant's conduct is privileged, unjustified inducement of a breach of the contract"; (4) "a subsequent breach by the third party caused by the defendant's wrongful conduct"; and (5) "damages resulting from the breach." *MetroPCS v. Devor*, 215 F. Supp. 3d at 636-37.

Pet-Ag has pled all of these elements here: (1) Pet-Ag has contracts with its Authorized Sellers that prohibit Authorized Sellers from selling to Pet-Ag products to any entity or person who, like Viglers, is not an Authorized Seller and who Authorized Sellers know or reasonably should know are going to resell the products (ECF 1 at ¶¶ 55, 130); (2) Viglers knew about these contracts because Pet-Ag's letters to Viglerss informed Viglers of the contracts (*id.* at ¶¶ 103-105, 133-137); (3) Viglers intentionally induced Authorized Sellers to sell Pet-Ag products to Viglers despite knowing that, by doing so, Viglers would be inducing breaches of contract (*id.* at ¶¶ 130-131, 138); (4) Viglers caused breaches of Pet-Ag's contracts with its Authorized Sellers when they induced Authorized Sellers to supply Viglers with Pet-Ag products in breach of their contracts (*id.* at ¶¶ 132, 137, 223-224); and (5) Pet-Ag suffered damages and injury as a result of Viglers' actions (*id.* at ¶¶ 227-228). Accordingly, Pet-Ag should also be awarded default judgment on its tortious

interference claim in addition to its other claims. *See MetroPCS*, 215 F. Supp. 3d at 634 (granting default judgment on tortious interference claim against unauthorized sellers).

        C.      <u>Pet-Ag is entitled to a permanent injunction</u>.

Pet-Ag does not seek an award of damages in the proposed default judgment it has submitted to the Court with its motion. To stop Viglers' continued unlawful conduct, however, Pet-Ag does seek the entry of a permanent injunction to prevent Viglers from further infringing Pet-Ag's trademarks and interfering with Pet-Ag's contracts with its Authorized Sellers.

The Lanham Act gives the Court the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark." 15 U.S.C. § 1116. To obtain a permanent injunction in a Lanham Act case, Pet-Ag must show: (1) "that it has suffered an irreparable injury"; (2) "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "that the public interest would not be disse[rv]ed by a permanent injunction." *MetroPCS*, 215 F. Supp. 3d at 638; *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (same). Here, Pet-Ag has met all four of these elements.

***First***, Pet-Ag has suffered an irreparable injury. A "plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for permanent injunction." 15 U.S.C. § 1116(a); *see also MetroPCS*, 215 F. Supp. 3d at 639 ("irreparable harm and inadequate remedy at law are presumed in trademark and trade dress infringement cases"). Pet-Ag has shown that Viglers has infringed its trademarks and no factors exist in this case that could rebut that presumption of irreparable harm. To the contrary, Pet-Ag has pled that Viglers' actions have

13

damaged Pet-Ag's brand reputation by causing consumers to receive poor quality products and leave negative reviews of Pet-Ag products (ECF 1 at ¶¶ 43-45, 118-120), interfere with Pet-Ag's quality control programs (*id.* at ¶¶ 112-117, 121-122), and damage Pet-Ag's business relationships (*id.* at ¶¶ 149-152). Accordingly, Pet-Ag has shown irreparable harm.

*Second*, damages are inadequate to compensate for Pet-Ag's injury. Without an injunction, Viglers will likely continue to infringe Pet-Ag's trademarks and Pet-Ag "would be forced to repeatedly file suit any time" Viglers does so. *MetroPCS*, 215 F. Supp. 3d at 639 (finding damages inadequate). Moreover, Viglers has not appeared in this case and has thus "shown complete disregard for [its] legal obligations and the jurisdiction of this Court." *Id.* Viglers' failure to appear means that a damages award may be difficult to collect and that Viglers will likely continue to infringe absent an injunction.

*Third*, the balance of hardships "weighs strongly" in favor of Pet-Ag. *MetroPCS*, 215 F. Supp. 3d at 640. As explained under the irreparable harm factor, Pet-Ag "is threatened with significant irreparable injury," including damage to its brand, quality control programs, and business relationships. *Id.* On the other hand, the proposed injunction merely stops Viglers from selling infringing products under Pet-Ag's trademarks and causes no cognizable harm to Viglers because Viglers has "no legitimate interest in illicitly trafficking in" infringing products bearing Pet-Ag's trademarks. *Id.*

*Finally*, granting an injunction is in the public interest. The "public interest lies in favor of upholding property interests in trademarks and preventing customer confusion." *MetroPCS*, 215 F. Supp. 3d at 640. The proposed injunction would minimize the risk that members of the public receive materially different products when they shop for Pet-Ag products online. *See id.* (public interest in obtaining genuine product weighed in favor of injunction).

14

**CONCLUSION**

For the reasons above, the Court should grant Pet-Ag's Motion for Default Judgment and issue a permanent injunction against Viglers that would prohibit Viglers from continuing to acquire or sell infringing products under Pet-Ag's trademarks and require Viglers to return or destroy products bearing Pet-Ag's trademarks that are in its possession.

Dated: April 25, 2023

Respectfully submitted,

*/s/ Daniel C.F. Wucherer*
Daniel C.F. Wucherer
VORYS, SATER, SEYMOUR AND PEASE LLP
301 E. 4th Street, Suite 3500
Cincinnati, OH 45202
Tel: (513) 723-4093; Fax: (513) 852-7811
dcwucherer@vorys.com

Matthew Jason Singer
MATT SINGER LAW, LLC
77 W. Wacker Drive, Suite 4500
Chicago, IL 60601
Tel: (312) 248-9123
matt@mattsingerlaw.com

***Attorneys for Plaintiff Pet-Ag, Inc.***